## Commonwealth v. Derstine

*Ward F. Clark*, Assistant District Attorney, and *Cyril L. Weston*, for Commonwealth.

*J. Lawrence Grim*, and *J. Lawrence Grim, Jr.*, for defendant.

FULLAM, J., February 4, 1964.—Defendant has filed motions for a new trial and in arrest of judgment, following his conviction of a violation of the Small Loans Act, Act of June 17, 1915, P. L. 1012, as amended, 7 PS §751, et seq. The evidence established that defendant loaned the prosecutor, Thomas H. Schlichter, Jr., the sum of $200, and obtained from him a judgment note calling for the payment of $220, with interest, etc. 30 days later.

Section 1 of the act, 7 PS §751, provides as follows:

"That on and after the passage of this act, it shall be unlawful for any person, persons, partnership, association, or corporation, within this Commonwealth, to make a loan of money . . . in the amount or of the value of three hundred ($300) dollars or less, either with or without security, to individuals pressed by lack of funds to meet immediate necessities, and charge, contract for, or receive on, any such loan a rate of interest, discount, fines, charges, or consideration

greater than six per centum (6%) per annum, without first obtaining a license from the Secretary of Banking in accordance with the provisions of this act."

Section 2 of the act, 7 PS §755, prescribes the schedule of interest which may be charged by small loan brokers duly licensed under the provisions of the act and provides for certain civil penalties against licensees who make excess charges.

Section 6 of the act, 7 PS §759, provides, inter alia, as follows:

"B. Every person, persons, copartnership, association or corporation . . . who shall, directly or indirectly, as principal, agent, or broker, by any device, subterfuge or pretense whatsoever, charge, contract for, or receive any interest, discount, fees, fines, charges or consideration greater than six per centum (6%) per annum upon the loan, use or forbearance of money, goods, or things in action, or upon the loan, use or sale of credit, of the amount or value of three hundred ($300) dollars or less, without having obtained a license under this act, shall be guilty of a misdemeanor . . ."

In support of the motion in arrest of judgment, it is contended: (1) The act does not apply to isolated transactions, and there can be no valid conviction in the absence of proof that defendant made more than one loan; (2) in order to justify a conviction under the act, it is necessary to prove that the borrower was "pressed by lack of funds" and that the purpose of the loan was "to meet immediate necessities," since (a) these expressions are used in section 1 of the act, in defining the offense with which defendant is charged; and (b) any other result would render the statute unconstitutional, since the title of the act does not give notice that the act contains provisions imposing penalties for any other kinds of loans, and because, if the act were interpreted to impose penalties for other kinds of loans, the act

itself would be unconstitutional on classification grounds.

Defendant's conduct falls squarely within the condemnation of section 6(B) of the act, in that he both demanded and received interest and other charges greater than six percent per annum; and the motion in arrest of judgment must be denied unless the legislature did not mean what it said, or unless the Constitution would be violated by the application of the statute to defendant under the circumstances presented by the record. Defendant's contentions need to be reviewed against the, background of the legislative history.

The Act of May 28, 1858, P. L. 622, pegged the lawful rate of interest at six percent per annum, but made it clear that the only penalties for usury were civil rather than criminal: Commonwealth v. Hill, 46 Pa. Superior Ct. 505 (1911); Selser's Estate, 141 Pa. 529 (1891); Appeal of Nicholson, 8 Sadler 396 (1887); Stout v. Stern, 89 Pa. Superior Ct. 479 (1926). Eventually, the lawful rate of interest at six percent proved insufficient to compensate for the risks involved in making small loans to poor credit risks, and the latter became the logical prey of "loan sharks." To remedy the situation, the legislature in 1913 passed the forerunner to the present Small Loans Act, in the Act of June 5, 1913, P. L. 429, which authorized persons, firms and corporations licensed by the court of quarter sessions to charge more than six percent interest. This statute was declared unconstitutional in Commonwealth v. Young, 248 Pa. 458 (1915). The Supreme Court held that the Act of 1913 represented special legislation in violation of article III, sec. 7, of the Constitution of Pennsylvania, noting that there was no logical basis for distinguishing between those who could charge more than six percent and those who could not, except the bare fact of obtaining a license.

Thereupon, the legislature passed the original version of the present Small Loans Act, the Act of June 17, 1915, P. L. 1012, which restricted the scope of high-interest loans permitted to licensees, to loans involving $300 or less, to "individuals pressed by lack of funds to meet immediate necessities." The constitutionality of the 1915 Act was upheld by the Superior Court in Commonwealth v. Puder, 67 Pa. Superior Ct. 11 (1917), and by the Supreme Court in Commonwealth v. Puder, 261 Pa. 129 (1918). The opinion of the Supreme Court contains the following:

"On the other hand, the Act of 1915 confines the class of loans to those not exceeding three hundred dollars and defines the class of borrowers as 'individuals pressed by lack of funds to meet immediate necessities.' It thus appears all persons are eliminated from taking the benefit of the act except those who desire to make loans not exceeding three hundred dollars in amount. Commonwealth v. Young did not decide the legislature might not pass a law regulating the business of loaning money in small sums. On the contrary, the opinion recognizes this right if a proper basis of classification can be found . . ." (pp. 134-35)

". . . the fundamental question is whether a necessity exists demanding legislation for the class of money lenders in sums of three hundred dollars or less to those of limited means who would otherwise be unable to procure needed funds, and whether classification adopted to meet such necessity is based on a real and not merely an artifical distinction . . ." (p. 136)

"There exists in the present case both a necessity and a valid basis for classification of the business of loaning money in small amounts, with or without security, and the distinction between the present law and the Act of 1913, which was declared unconstitutional in Commonwealth v. Young, supra, furnishes adequate support for the conclusion of the court below

that the present act cannot be condemned on the ground of improper classification." (pp. 137-8)

A review of both the Superior Court and Supreme Court opinions in the Puder case makes it clear that the question of reasonable classification, to avoid the prohibition of article III, sec. 7 of the Constitution, is important only in connection with the grant of the privilege to exact a high rate of interest. It is not necessary to find a reasonable classification in order to uphold the imposition of penalties for charging excessive interest.

As applied to the present case, defendant could justify charging excessive interest by showing (1) that he was licensed under the act, and (2) that the issuance of a license under the act was not a special privilege in violation of article III, sec. 7, of the Constitution, but was based upon a reasonable classification, namely, that the loan involved less than $300 and involved a borrower "pressed by lack of funds to meet immediate necessities." But in the absence of a license under the act, the Constitution drops out of the picture, and the question is merely one of legislative intent.

We have been unable to find a reason which would justify disregarding or altering the plain language of section 6 (B). The legislature having decided to regulate the business of lending money in sums of $300 or less, it is altogether to be expected, in the normal legislative scheme, that provision would be made, on the one hand, to grant licenses, and on the other, to impose sanctions against those who do not obtain licenses. To adopt defendant's interpretation of the statute, and make the imposition of sanctions dependent upon proof of repeated violations, or upon proof of the precise purpose of the borrower in obtaining the loan, would be to read into the statute language which is not there, and to render enforcement exceedingly difficult.

The legislative history makes it reasonably clear that section 1 was not intended as providing the definition of the criminal offense under this statute. On the contrary, up until 1937, section 1 of the act was worded affirmatively, i. e.,

". . . it shall be lawful for any person . . . who shall comply with the requirements of this act, to loan money in sums of three hundred ($300) dollars or less, either with or without security, to individuals pressed by lack of funds to meet immediate necessities, and charge and collect for the loan thereof interest as hereinafter provided . . ."

And the penalty provisions of section 6 applied to any one "who shall violate any provision of this act . . . or who shall lend money in sums of three hundred ($300) dollars or less, and charge or receive for the loan or use thereof interest in excess of six per centum per annum, without first having complied with the provisions of section one of this act . . ."

In 1937, the act was extensively amended by the Act of May 28, 1937, P. L. 989, which was entitled "An Act to amend [the 1915 statute] by restricting the business of lending by others than licensed lenders . . . increasing the penalty for operation without a license . . . and imposing additional penalties."

As thus amended, section 1 was worded negatively, as in the present version of the statute. Instead of permitting persons who comply with the statute to make loans at high interest rate, the act simply states that it is unlawful to do so "without first obtaining a license from the Secretary of Banking in accordance with the provisions of this act." The penalty provisions were also revised to approximately their present form, with separate provisions for violations by licensees and violations by persons who have not obtained a license. Reading the present statute as a whole, and particularly in light of the legislative history, it is quite clear

that section 1 was and is designed and intended to prescribe the conditions for the grant of the privilege of lending money at excessive interest rates, and not to define the criminal offense with which this defendant is charged. That is, section 1 tells us what may be done, section 6 what may not be done. The loan here in question clearly violates section 6(B), and the motion in arrest of judgment must therefore be denied. The title of the act is sufficient: Commonwealth v. Puder, supra, 67 Pa. Superior Ct. 11; 261 Pa. 129.

Defendant's motion for a new trial asserts two grounds. The first is, that the trial judge erred in failing to instruct the jury that they must acquit the defendant unless they found that the prosecutor was "pressed by lack of funds to meet immediate necessities." For the reasons set forth above, we believe the quoted phrase is not an essential element of the crime charged, but is at most one of the limitations upon the granting of privileges to licensees under the act. In any event, we note that the Superior Court in Commonwealth v. Puder, supra, 67 Pa. Superior Ct. 11, stated at page 19:

"Futhermore the court could take judicial notice of the fact that no reasonable person would borrow $300 or less and agree to pay 24 to 36 per cent. interest unless he came within the class described as 'individuals pressed by lack of funds to meet immediate necessities.' "

The second ground alleged is that the trial judge erred in excluding proffered testimony by a member of the bar as to what would constitute a fair and reasonable charge for drafting the loan papers. As stated at the outset, defendant loaned the prosecutor $200 and obtained a judgment note which required the repayment of $220 plus interest 30 days thereafter. In addition, defendant obtained a security agreement covering certain chattels. The prosecutor claimed that

defendant had verbally granted an extension of time for repayment, but defendant denied this. Be that as it may, when the loan was not repaid at the end of the 30-day period, defendant recorded the judgment and the security agreement and, with a search warrant, seized the chattels. He also had the prosecutor arrested for fraudulent conversion, but that aspect of the case is not before us. The prosecutor had to pay defendant the total sum of $235.50 to obtain the release of his chattels and the satisfaction of the judgment. The original loan occurred on August 15, and the payment was made October 19.

Defendant sought to justify the charges as including, inter alia, the fair and reasonable cost of his services in preparing the security agreement, and called a member of the bar to testify as to the fair and reasonable charge for such services. This testimony was excluded, the trial judge ruling that the testimony would be irrelevant unless it were shown that defendant had incurred the expense of having a member of the bar prepare the papers for him. Defendant then sought to have the same witness testify as to the fair and reasonable value of defendant's own services in preparing the agreement, but the trial judge ruled that the witness was not shown to be qualified as an expert with respect to the reasonableness of charges by laymen for such services. No attempt was made to show that the witness was so qualified.

We believe that the rulings complained of were entirely correct, but note that in any event, defendant was given the benefit of all of his contentions in the charge of the trial judge to the jury. The jury was told, in effect, that unless they were convinced that the excess money was charged *as interest,* and so intended by both parties, they could not convict. Moreover, the total of the charges would have been excessive even under defendant's own version. And finally, as noted

by the trial judge, none of the charges were incurred until after the note became due and payable according to its terms. The subsequent charges furnish no justification for the terms of the original note, which on its face clearly violates the statute. The motion for a new trial must be refused.

### Order

And now, February 4, 1964, for the reasons set forth in the foregoing opinion, defendant's motions in arrest of judgment and for a new trial are overruled and refused, and defendant is directed to appear for sentence on Friday, February 14, 1964.